IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| THOMAS RODDEY, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | CAFN: |
| | ) | |
| INSTITUTE OF NUCLEAR | ) | |
| POWER OPERATIONS, INC. | ) | JURY TRIAL DEMANDED |
| | ) | |
| | ) | |
| *Defendant.* | ) | |

**COMPLAINT FOR DAMAGES**

Plaintiff Thomas Roddey ("Mr. Roddey"), files this Complaint against the Institute of Nuclear Power Operations, ("INPO" or the "Institute"), to vindicate his rights and recover all permissible damages under controlling law because Defendant violated Mr. Roddey's rights pursuant to 42 U.S.C. § 1981, to be free from racial discrimination and disparate treatment, including retaliation, regarding Mr. Roddey's compensation, terms, conditions, or privileges of employment.

## **INTRODUCTION**

When a company such as INPO has been operating in Atlanta for over 40 years and has never had an African American hold one of its executive positions, and virtually all of those top positions have been held by whites—suing INPO for race discrimination should come as no surprise. Rarely, can the proverbially "glass ceiling" be so clearly seen as within INPO's corporate structure. Mr. Roddey, and a host of extremely qualified African-American INPO employees, have been bumping up against this ceiling for decades. During this same time period, INPO has engaged in one of the most heartless, denigrating, and morale crushing tactics known: providing people of color with false hope, by having them hop around, allegedly, "diversifying their talent" while INPO promotes less qualified and less deserving white people.

Mr. Roddey has immeasurable credentials and talent—acquired from decades of nuclear and military experience. INPO has been playing the false hope game with Mr. Roddey as well, placing him on INPO's Progression Plan to be a "VP" by 2023, but he has not even made the Director position. Of no coincidence is the fact that Mr. Roddey has also consistently voiced concern about, and been a critic of, INPO's treatment of African-Americans and other people of color. For example, INPO initiated a five-year plan to have a group of highly talented African American employees develop as "VP - ready now," but

failed to fulfill its promises to these employees. Mr. Roddey brings this suit to vindicate his rights and thus hold INPO accountable for its demonstrable racist and bias practices.

## JURISDICTION AND VENUE

1.

Jurisdiction is proper under 28 U.S.C. § 1331 and 1343(a)(4). Venue is proper under 28 U.S.C. § 1391(b) and L.R. 3.1(B)(3) because (1) a substantial part of the events and omissions giving rise to Mr. Roddey's claims occurred in this District and Division.

## PARTIES

2.

**Plaintiff THOMAS RODDEY** is currently employed with INPO. Mr. Roddey is a Georgia citizen, residing in Georgia.

3.

**Defendant INPO** is a foreign non-profit corporation, registered to do business in Georgia, with a principle office address at 700 GALLERIA PKWY SE, SUITE 100, ATLANTA, GA, 30339-5943, USA. INPO can be served by executing service of process on its registered agent, Prentice Hall Corporation, at 2 SUN COURT, SUITE 400, PEACHTREE CORNERS, GA, 30092, USA.

4.

INPO conducts reviews and evaluates performances at nuclear stations and utilities throughout the country. It was established in 1979 by the U.S. nuclear power industry in response to the Three Mile Island nuclear meltdown in Pennsylvania in 1979.  INPO has been doing business in the United States, with Georgia as its home base, for over forty years.

5.

Additionally, INPO has partnerships with American Nuclear Insurers; U.S. Department of Energy; Electric Power Research Institute; International Atomic Energy Agency; Japan Nuclear Safety Institute; Nuclear Energy Institute; Nuclear Electric Insurance Limited; U.S. Nuclear Regulatory Commission; and the World Association of Nuclear Operators – Atlanta, London, Paris, Moscow, Tokyo Regional Centers.

## STATEMENT OF FACTS

A.   Brief, exceptional professional history of Mr. Roddey

6.

Mr. Roddey has more than 30 years of experience in military and commercial nuclear power plants, which includes the types of companies INPO serves.

7.

Starting circa 1991, Mr. Roddey was a leading Engineering Laboratory Technician and First Class Petty Officer in the U.S. Navy, managing six people responsible for radiochemistry analysis and radiological surveys. He then became a plant operator, a position that required him to gain knowledge of, operate, and maintain all primary, secondary, and auxiliary systems supporting reactor plant operation.

8.

Mr. Roddey became a regulatory licensing engineer for Exelon Nuclear (now Constellation)—the largest commercial nuclear utility in the United States. In this position, Mr. Roddey was the lead licensing engineer for responding to an issue that had adverse implications for the operation of all boiling water reactors in the US fleet at extended power uprated (EPU) levels. This issue required four units in the Exelon fleet to lower power to their originally licensed level. Due to Mr. Roddey's leadership, however, Exelon received regulatory approval for the four units in their fleet to return to EPU operation.

9.

His exceptional work led Mr. Roddey to become the assistant to Chief Operating Officer, Chip Pardee, of Exelon Nuclear. In that role, Mr. Roddey prepared board briefings, reviewed, adjusted, and implemented strategic plans, while also preparing fleet initiatives, such as a fleet equipment reliability improvement strategy.

10.

Looking to take advantage of career growth opportunities, after acquiring extensive knowledge under Mr. Pardee, Mr. Roddey became a training support manager, ensuring the effective implementation of training protocols for Oyster Creek Nuclear Plant. In fact, this commercial plant had a loss of ultimate heat sink event, a challenge to plant operators that can contribute to the likelihood of reactor core damage. Causal analyses for the event attributed shortfalls in operator knowledge, skills, and training as contributors to the event; this was seen as a significant threat to successful reaccreditation of operator training programs. However, and once again, because of Mr. Roddey's effective engagement with fleet executives, fleet and site senior leaders, and operator and training stakeholders, Mr. Roddey authored an Accreditation Self-Evaluation Report (ASER) that supported successful reaccreditation of the operator training programs following this significant event.

11.

With this tremendous accomplishment, Mr. Roddey then became Engineering Programs Manager at Oyster Creek, managing eight to nine people in the areas of:

1. Thermal Performance;
2. Aging Management;
3. Buried Pipe Inspection; and
4. Reactor Vessel Inspection.

In this role, Mr. Roddey ensured the overall integrity of reactive vessel and steam supply equipment. Following this success, he became the Design Engineering Manager at Prairie Island Nuclear Plant, assuming the role of site design authority. Mr. Roddey was quickly promoted to Site Engineering Director.

12.

In addition to his experience within the nuclear power industry, Mr. Roddey serves as a member on the **Industry Advisory Board for the University of North Carolina** at Charlotte's College of Mechanical Engineering. The Board advises the Chairperson and faculty of the College to help develop curricula and programs aimed at ensuring engineering students are prepared for academic and professional success, and have skills that will drive higher levels of performance across many industries.

13.

The above assertions found in paragraph 6-12 represent a mere sample of Mr. Roddey's experience, and talent profile — all talents acquired prior to joining INPO in 2014.

14.

Notably, Mr. Roddey was never terminated from any employment position and never resigned in lieu of termination.

15.

INPO leadership at all times relevant **have been aware of Mr. Roddey's diverse talent profile**, as evidenced by INPO's "Talent Profile" document on Mr. Roddey, which lists the job history noted above and the following "skills and qualifications" further acquired at INPO:

1. Assistance Team Leader;
2. Configuration Management Evaluator;
3. DSPOC- Eng Config Management;
4. DSPOC Industry Leadership;
5. Equipment Reliability Evaluator;
6. Evaluation & Peer review Team Leader;
7. Special Focus Team Member;
8. QL-OR Team Leader w/PI;

9. Special Focus E.R. Evaluator;

10. QL- DSPOC-Equipment Reliability;

11. QL-Emergency Director, proficiency high;

12. QL-IRC Asst. Emerg. Dir, proficiency high;

13. QL-Senior Management Representative;

14. RO Certification; and

15. SRO Cert-PWR.

16.

Mr. Roddey's exemplary leadership talent is also captured in his 2023 job performance evaluation, which highlights outstanding recognitions from his direct supervisor such as "There are **no** weaknesses in any of the values or leadership attributes to discuss. The attribute I see the strongest in Thomas is 'Builds and Sustains **Trust** with Employees and Stakeholders," and "[his] demonstrated ability to influence outlier performance in CY and RP. The same can be said for outlier IS performance both domestically and abroad."

17.

There simply is no **valid** reason Mr. Roddey's progression has stopped at the manager level other than unlawful discrimination, especially when **according to INPO**, Mr. Roddey should be a VP by now.

### B. Mr. Roddey's experience at INPO and INPO's Diversity Progression Program

18.

Mr. Roddey has been working at INPO for approximately 10 years; his performance, including his leadership, saw him being fast-tracked through the ranks.

19.

In fact, INPO placed Mr. Roddey on **a Diversity Progression Program**, which saw Mr. Roddey starting at RL/D and advancing to a VP position; however, instead of advancing Mr. Roddey through these ranks, his advancement has stalled, and during this time period, similarly-situated Caucasians — **with far less qualifications** — experienced career advancement through job promotion to positions that INPO knew Mr. Roddey desired and was more qualified to hold.

### C. Relevant INPO structure and racial discrimination experienced by Mr. Roddey

20.

Mr. Roddey was a member of the Plant Operations and Technical Support group of the Industry Strategy. Within his group there had been two directors,

and each director had two to three managers. Mr. Roddey is one of those managers, and he is African American.

21.

While Mr. Roddey has stayed put as a Manager, several other Caucasians, who were his peers (Chad Hyde, Brad Drysdale, Larry Lucas, and John Musser) have all been promoted to the Director position. In addition, Kenny Comeaux, another Caucasian employee, has been promoted from Team Leader to Manager and subsequently to Director of Data Science (effective promotion date of June 16, 2023), in the time frame that Mr. Roddey has remained at the Manager level. (Mr. Roddey received feedback on the bases for not being selected as the Director of Operations for World Association of Nuclear Operations (WANO), and for the Director of Data Science. He did not receive a basis for why he was not selected for other Director positions.)

22.

Significantly, every Caucasian person who was a manager in the same group (Plant Operations and Technical Support), at the time Mr. Roddey came into said group, have been promoted to Director. Specifically (in addition to Hyde (June 16, 2022) and Comeaux, Larry Lucas was promoted (June 16, 2022) to Director of Industry Training and Accreditation, and Brad Drysdale was promoted (June 1, 2022) to Director of Plant and Corporate Evaluations.

23.

In fact, Mr. Roddey was passed over again most recently, seeing Brad Drysdale laterally transferred to a Director position, which represents a consolidation of two Divisions. INPO then filled Drysdale's old Director position with John Musser. So, rather than provide Mr. Roddey with an opportunity as a Director, INPO consolidated Divisions and then filled Drysdale's vacant Director position with a much less qualified and experienced Musser—**mindful that all the while, Mr. Roddey is supposed to be on track to be a VP by 2023**. The Diversity Progression Program **is a farce**, and promoting Vanessa Locke to Director-- **after a lawsuit has been filed**-- does not make the Program any less of a **farce**.

24.

Prior to the promotions discussed above of Hyde, Drysdale, Lucas and Musser—in July 2020, Mr. Roddey was assigned as the Manager of the Radiation Protection workgroup, supervising eight employees, also while continuing in his prior role as an Evaluation and Peer Review Team Leader. In January 2022, Mr. Roddey's role was expanded to include the Chemistry workgroup, raising the number of employees under his supervision to 16. While his peers were being promoted, Mr. Roddey was assigned additional roles and action that were stated as "opportunities" to gain **executive visibility; enhance his image; and improve**

**his likelihood of promotion**. This included a **year-long assignment** as the chair of the INPO Managers Forum, a position that **allegedly** provided Mr. Roddey the chance to show himself as a "**manager among managers**." In this role, Mr. Roddey was the **first Chair** to broaden the role to include engagement with the Senior Leadership Team and the Directors Forum so that the managers could better align with the strategic vision and goals of the organization. Despite successfully completing this assignment and more, Mr. Roddey still got passed over for **Director positions** by his less qualified Caucasian counterparts.

    D.    **INPO undoubtedly has a "glass ceiling" regarding the advancement of African Americans to executive leadership positions**

25.

INPO has given African Americans false hope for years with respect to advancing to executive leadership positions. For example, and as mentioned earlier, INPO has an alleged Diversity Progression Program, which had Mr. Roddey advancing to the "VP" position by 2023. Significantly, that same Diversity Progression Program laid out a plan to have multiple African Americans advancing to the VP level by 2023. But not one—and again, not one—said African American, including Mr. Roddey has advanced to a "VP" position. INPO does not want African Americans at these positions and the statistics and false commitments bear that out.

26.

There is zero doubt, INPO has a pattern and practice of discriminating against African Americans.

## COUNT I
## DISCRIMINATION AND RETALIATION BASED ON RACE
## IN VIOLATION OF 42 U.S.C. § 1981

27.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-26, as if fully stated herein to support all allegations made in this Count.

28.

Based on the facts and assertions incorporated to support this Count, Defendants have intentionally discriminated against and retaliated against Mr. Roddey in direct violation of 42. U.S.C. § 1981, including in the form of disparate treatment, because of Mr. Roddey's race and because of his known opposition to being subjected to race-based discrimination. Based on the facts and assertions incorporated to support this Count, Defendant's discrimination and retaliation caused Mr. Roddey irreparable harm by unlawfully denying him the ability (granted to Caucasian similarly-situated employees) to obtain professional growth and development including job advancement and promotions *inter alia*.

Regarding retaliation, in addition to the incorporated facts to support this Count, Mr. Roddey also relies on the following facts. In 2018, Bob Willard hired a

private consultant to assess why an employee engagement survey had low ratings in the area of women of color and minorities, including concerns regarding advancing to senior leadership positions. Mr. Roddey complained about this and requested that steps be taken to change this all-white senior leadership team reality. In that same year, 2018, Mr. Roddey noted to Mr. Willard again that an alleged five-year plan to advance people of color to VP positions was supposedly in effect, but no people of color seemed to be advancing/breaking the proverbial glass ceiling. Again, Mr. Roddey implored Mr. Willard to change this all-white reality. Mr. Willard responded by telling Mr. Roddey that caution had to be taken because there would be backlash from the "old white guys." Mr. Willard noted that the five-year plan would conclude at the end of his term and thus the new CEO would have to deal with this alleged new "diversity" at the higher ranks. Ironically, Mr. Willard's contract was renewed and there is not one person of color at said level of INPO.

With the above in mind, from 2018 through as recent as 2023, Mr. Roddey repeatedly identified and discussed—during periodic senior leadership and extended leadership team meetings—the necessity to ensure that people of color, including African Americans received fair treatment, particularly in performance reviews, and afforded the opportunity to advance to senior leadership and executive positions. For example, as recent as 2023, Mr. Roddey discussed a 2023

pulse survey result in which the lowest score on the test related to race and culture at INPO. Mr. Roddey identified and communicated that senior executives discussed steps to be taken with respect to other areas that scored low but essentially refused to discuss steps to be taken to correct the issue of race and culture in INPO. Relevantly, during the period Mr. Roddey complained about the failure of INPO regarding broken promises to advance, inter alia, African Americans to executive positions, INPO refused to promote Mr. Roddey to Director or above despite him being more qualified than many materially similar Caucasian counter parts who were promoted to Director positions.

## COUNT II
## PUNITIVE DAMAGES

29.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-28, as if fully stated herein to support all allegations made in this Count.

30.

Based on the facts incorporated to support this Count, Defendant's conduct was, and still is, willful, wanton, and has demonstrated an entire want of care which raises the presumption of a conscious indifference to consequences. Consequently, Mr. Roddey is entitled to punitive damages and a Judgment against Defendant of no less than five-million ($5,000,000) dollars.

## COUNT III
## ATTORNEY FEES AND COSTS OF LITIGATION

31.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-30, as if fully stated herein to support all allegations made in this Count.

32.

**Based on the facts to support this Count, Mr. Roddey is entitled to** attorney fees, under 42 U.S.C. § 1988, inter alia.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Roddey respectfully prays and requests a trial by jury and judgment of this Honorable Court against Defendant as follows:

(a) The process issue and service be had on Defendant;

(b) That judgment be granted in favor of the Plaintiff against the Defendant, on all matters this Court deem are matter of pure law, jointly and severally, for the injuries of Plaintiff. And that all other matters be resolved by a jury;

(c) That Plaintiff recover all damages permissible by law, to include compensatory damages, punitive damages, and **special damages**, including any back pay, future lost income, damages for his reduction in earning capacity and other expenses in an amount not less than five-million dollars ($5,000,000);

(d) Plaintiff recovers all costs of litigation, including reasonable attorney fees;

(e) That a jury trial be had on all issues so triable; and

(f) That this Court enter and award such other and further relief to which Plaintiff may be entitled as a matter of law or equity, or which the Court so determines to be just and proper.

Respectfully submitted this 16th day of June 2024.

**/s/ MARIO WILLIAMS**
Mario Williams
Ga. Bar No. 235254

**HUMANITY DIGNITY AND RIGHTS LLC**
5600 Roswell Road
Building C, Suite 103
Sandy Springs, Georgia 30342
(404) 341-4434
mwilliams@hdrattorneys.com
admin@hdrattorneys.com

*Counsel for Plaintiff*